**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                           )
ANTHONY GAMBINO, et al.,                   )        CIV. ACTION NO. 03-1611(FSH)
                                           )
          Plaintiffs,              )
                                           )
             v.                       )        **OPINION**
                                           )
LIBERTY LIFE ASSURANCE COMPANY)                     Dated:  November 15, 2005
OF BOSTON, et al.,                         )
                                           )
          Defendants.              )
_____)

**HOCHBERG, DISTRICT JUDGE**

Plaintiffs Anthony and Danielle Gambino claim that Liberty Life Assurance Company of Boston violated the Employee Retirement Income Security Act ("ERISA") by denying Anthony Gambino's application for short-term disability benefits.[1]  Plaintiffs also claim that because Plaintiff was denied short-term disability benefits he was unable to apply for and consequently obtain long-term disability benefits.  A trial without a jury was held.  This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

---

[1]  Plaintiffs also sued Defendant Dr. Arnouk, claiming that his failure to respond to requests for medical information from Defendant Liberty resulted in their denial of benefits.  At the conclusion of trial this Court found in favor of Dr. Arnouk, concluding that insufficient proofs of liability had been established.

## I.    FINDINGS OF FACT[2]

Plaintiff Anthony Gambino worked at IKON from April 1996 until March 2001 as a sales account manager.  Gambino's duties involved going out on the road to develop new business clients, service current customers, and sell office equipment.

On March 9, 2001, Plaintiff was at a sales meeting to give a presentation when he felt as if he were going to have a heart attack and die.[3]  After notifying his sales manager, Brian Duff, Plaintiff left the office and went directly to see Dr. Arnouk, his primary-care physician.  Despite the fact that he did not have an appointment, Dr. Arnouk met with Plaintiff for approximately 20 to 25 minutes.  Dr. Arnouk prescribed Paxil and advised Gambino not to return to work.[4]

Plaintiff testified that he had never had an episode such as he felt in the sales meeting[5] and had not been suffering from any type of anxiety or problems previous to that date.  After seeing Dr. Arnouk, Plaintiff felt he could not do anything, and basically remained in his home

---

[2]  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law.

[3]  Plaintiff also described an incident on or about March 9, 2001, prior to the sales presentation, in which he had become very angry with one of his colleagues, his sales manager, and proceeded into the office with a bat with the intention to do harm.  He was stopped by someone in his office.

[4]  Dr. Arnouk had been treating Mr. Gambino for diabetes, and had seen him prior to March 9, 2001 "for a fair amount of time," but had never seen him in the type of hyper-anxious condition that he saw him on that date.  Dr. Arnouk made no note from March 9, 2001, but had a very strong recollection of the event, and he kept Plaintiff out of work because he felt it would be "very, very risky" for Mr. Gambino to return to work.

[5]  Danielle Gambino testified that about a week before March 9, 2001, Plaintiff was experiencing cold sweats and was feeling sad and angry.

unable to even bring himself to do simple tasks, such as getting the mail.  Gambino eventually

went to St. Clare's Hospital for an evaluation on March 27, 2001.

Danielle Gambino[6] testified that in early March 2001, after the appointment with Dr.

Arnouk and at his suggestion, she sat down with a list of participating physicians with Plaintiff's

medical insurance carrier in order to obtain the earliest available appointment for psychological

care for Plaintiff.  She stated that it took two to three weeks to receive an appointment for

Plaintiff.  The first available appointment for Plaintiff was with St. Clare's Hospital on or about

March 27, 2001, where an initial intake evaluation was conducted and Plaintiff was prescribed

Paxil by a Dr. Tintea.[7]

Plaintiff then began seeing Marion Robinson, a therapist associated with St. Clare's.  Ms.

Robinson later referred Plaintiff to Dr. Jean Ying-Chang, a psychiatrist also affiliated with St.

Clare's, for a psychiatric evaluation.  Plaintiff also testified that he spent one day hospitalized at

St. Clare's as part of the in-patient/out-patient program at Marion Robinson's recommendation.

Danielle Gambino assisted Plaintiff in making his claim to Liberty Life Assurance

Company of Boston ("Liberty") for short-term disability benefits.  On or about April 5, 2001,

Danielle contacted Liberty to inquire about Plaintiff's claim.  She informed Liberty that Plaintiff

---

[6]  Danielle is Plaintiff's wife.  However, at the time of the events discussed herein, Danielle was Plaintiff's fiancee.

[7]  At least two separate records, Dr. Ying-Chang's Evaluation of Plaintiff, D-20, and An Initial Evaluation from St. Clare's Hospital, D-19, refer to a Dr. Tintea as having prescribed Paxil for Plaintiff, presumably upon initial intake of Plaintiff on March 27, 2001.  Defendant Liberty did not request any records from this physician despite knowledge that Dr. Tintea was a treating physician.

had been to see Dr. Arnouk and had been evaluated at St. Clare's Hospital.  She also informed

them that he had begun treatment with Marion Robinson.

      Liberty provides a short-term disability insurance policy for IKON employees as part of

IKON's group disability insurance plan ("the plan") for its employees.  The plan was in effect on

March 9, 2001.  Liberty was also the claims administrator for the policy.  The policy vested

Liberty with authority, in its sole discretion, to construe the terms of the policy and to determine

benefit eligibility.  It further provided that such interpretations or decisions by Liberty would be

conclusive and binding.

      In addition to the short-term disability policy (hereinafter "STD"), Liberty administered a

long-term disability policy (hereinafter "LTD"), which was self-funded by IKON.  Under the

terms of the LTD policy, Liberty had the sole discretion to determine whether any claim or suit

arising by reason of Liberty's alleged liability would be paid, litigated, compromised, or

appealed, as well as to  determine the defense for such suit.

      In order to receive short-term disability benefits under the STD policy, the covered person

is required to provide Liberty with proof that he had a "disability" and, when applicable, "regular

attendance of a physician."  "Regular attendance of a physician" is referenced in the policy, but

no definition of that term is provided.  Under the STD policy, "disability" is defined as a

condition where the covered person is unable to perform all of the material and substantial duties

of his or her occupation on an "active employment" basis as a result of an "injury" or "sickness,"

as those respective terms are further defined in the policy.  The short-term disability must

continue for a period of fourteen days beginning with the first day of the disability before benefits

are payable.  The STD benefits are payable for a period of six months.

Under the LTD policy, "disability" is defined as a person who is a covered person, and who, during the "elimination period" and the next 24 months, is unable to perform all of the material and substantial duties of his or her occupation on an "active basis" as a result of an "injury" or "sickness," and after 24 months of benefits have been paid is unable to perform such duties. The "elimination period" under the LTD policy is six months, which coincides with the period during which short-term disability benefits are paid. Both the STD and LTD policies define disability using the same terms.

Pursuant to the LTD policy, Liberty retains discretion to settle any lawsuits regarding its alleged liability in connection with the performance of its functions under the policy. However, IKON retained the discretion to overrule Liberty's denial of benefits. Monica Dube testified that if Liberty denied benefits, IKON could overrule Liberty and award benefits. In contrast, under the STD policy, Liberty had exclusive and total authority to make its determination about disability, which could not be overruled by IKON.

Beginning April 5, 2001, Liberty began requesting information from IKON as to Plaintiff's claim. Although required to make a determination as to whether Gambino was able to perform all of the material and substantial duties of his occupation, at no time during the evaluation process did Liberty make any inquiry or receive any information from IKON as to the nature of Plaintiff's duties. After being advised on April 5, 2001, that Dr. Arnouk and St. Clare's Hospital were both involved with Plaintiff's treatment, on April 18, 2001, Liberty forwarded by fax to Dr. Arnouk a form, requesting information regarding Plaintiff's condition and treatment. Liberty never sent a form or requested information from St. Clare's Hospital regarding Plaintiff's treatment beginning March 27, 2001.

5

Liberty advised Plaintiff by letter of April 20, 2001 that it had not obtained records from Dr. Arnouk and requested that Plaintiff contact Dr. Arnouk to urge completion of medical forms. After receiving the letter, Plaintiff gave Dr. Arnouk the paperwork he had been given by his supervisor, Brian Duff, for the needed information.  On June 24, 2001, Dr. Arnouk completed and signed a Certification of Physician form and Attending Physician's Statement, both forms provided to him through Liberty.  In these forms, Dr. Arnouk certified that:  (1) he had diagnosed Plaintiff with severe anxiety reaction with depression and psychological setback, as well as a diabetic condition;  (2) the condition commenced on March 2, 2001;  (3) Mr. Gambino was referred to a psychologist and psychiatrist; and  (4) Plaintiff's first visit with him was March 9, 2001 and the last visit was June 24, 2001, and that Plaintiff was seeing him weekly.  He also indicated under the section for mental/nervous impairment that the patient was unable to engage in stressful situations or engage in interpersonal relations (marked limitations).  Dr. Arnouk certified that he referred Plaintiff to a psychiatrist, and that Plaintiff was on medication and was not cleared to go back to work.

Liberty received the claim forms sent by Dr. Arnouk on or before July 10, 2001.  After receiving the information from Dr. Arnouk, Liberty's claim manager, Monica Dube, spoke with Plaintiff on July 12, 2001.  Plaintiff advised Ms. Dube that he had not had the same diagnosis in the past, and that his initial symptoms were chest pains, sweats, and a loss of energy.  He discussed seeing Dr. Ying-Chang and Marion Robinson, and being treated once per week. Plaintiff informed Ms. Dube that Dr. Arnouk initially started him on medication, but Dr. Ying-Chang had been adjusting the medications.  He further reported that his symptoms had not

changed, and he was not improving.  Ms. Dube then requested medical records from Dr. Ying-Chang and Ms. Robinson.

Dr. Ying-Chang had already sent a letter dated July 10, 2001 to Deborah M. Agnew-Warner, providing answers to sections of the Certification of Physician form that Dr. Arnouk had not answered.  Dr. Ying-Chang stated that Plaintiff was being treated at St. Clare's Behavioral Health Center in Franklin, that his diagnosis was social phobia, major depressive disorder, R/O bipolar disorder, and that Plaintiff was unable to work as of March 27, 2001 (the date of his first appointment at St. Clare's Hospital).

Dr. Ying-Chang provided records concerning her psychiatric evaluation of Plaintiff and his prescribed medications.  These records were received by Liberty on July 25, 2001.  The records contained:  (1) the history of illness including Plaintiff's panic attack during his sales presentation in March, 2001;  (2) his feelings of anger with impulses to violence;  (3) his thoughts of hurting others due to his distress and violent actions taken in the past;  (4) his feelings of paranoia, irritability and depression over the past one and a half to two years;  (5) his difficulty sleeping (he was sleeping only four hours per night due to racing thoughts) and concentrating;  (6) his increased agitation; and  (7) his increasingly vivid nightmares.  Dr. Ying-Chang noted that Plaintiff was in treatment with Dr. Arnouk who had prescribed various medications; that he was also in treatment with Marion Robinson at St. Clare's Hospital; and that he had been prescribed Paxil by Dr. Tintea.  The past psychiatric history included a reference to treatment at age 14, and no other prior treatment.  Dr. Ying-Chang concluded with a diagnosis of social phobia, major depression, history of alcohol abuse in remission, diabetes and history of pancreatitis.  She ruled out possible bipolar disorder.  She diagnosed Plaintiff as suffering from

problems with primary support group, peer relationships, and occupational functioning.  She prescribed various medications and continued individual therapy.

Records were also received from Marion Robinson, the first page of which indicated that the intake was March 27, 2001, her records were on documents identifying St. Clare's Hospital Behavioral Health Services.  The records noted that Plaintiff presented with the problem of panic attacks, job stress and an increase in depression and anxiety.  Her records, signed April 9, 2001, indicate a diagnosis of panic disorder and major depressive disorder.  The diagnosis also noted job stress.  The information and records provided to Liberty by Drs. Arnouk and Ying-Chang, and therapist Robinson were then forwarded by the Liberty claims handler to a service for review.

The records were reviewed by a registered nurse, Barbara McGivern.  Nurse McGivern provided answers to certain questions which were presented to her.  She stated that: (1) the limitations were not supported by the medical information in the file; (2) the claimant had a history of one and a half years of panic attacks; and (3) that the incident reportedly happened on March 2, 2001 yet he did not see his primary care physician until March 9, 2001.  She questioned if the claimant sought emergency care on or about March 2, 2001 and stated that he continued to work through March 9, 2001.  She stated that there were no primary care physician office notes to explain "what changed" and that Dr. Arnouk's office notes were missing.  She stated that it was unclear what medical doctor saw claimant on March 27, 2001, or what the findings were based on limited notes from that date, and she recommended clarifying this information.  Despite having many questions concerning Plaintiff's claim, Nurse McGivern recommended contacting only the physician, and not Plaintiff, for additional information.  She again stated that it appeared

8

from the information that "medicals" had been repeatedly requested from the primary care physician unsuccessfully, and without that information, it was not clear as to "what changed" to prevent the claimant from performing the duties of his job.

Ms. Dube, the claims handler, discussed Nurse McGivern's review with her manager, Nancy Mayo. She advised that Nurse McGivern had recommended that Liberty obtain office visit notes from the primary care physician and a psychiatrist to make an initial determination. Ms. Mayo directed Ms. Dube to wait for medical information to come in through August 10, 2001 (the end of the 30-day period from the date they had previously requested information), and if no new medical information was received, they would review for denial.

Liberty acknowledges that after the review by Nurse McGivern, the decision was made to do nothing further, to wait for the August 10 date, and if nothing further was received, to deny the claim. Liberty conceded that it was simply the lack of an official office visit record from Dr. Arnouk detailing the unscheduled sudden visit of March 9, 2001 which caused the denial of the claim.

On August 14, 2001, Liberty forwarded correspondence to Plaintiff denying benefits. Plaintiff appealed the decision by letter of August 20, 2001. The letter of denial cited certain provisions within the policy, advised Plaintiff that medical records had been received from Dr. Ying-Chang and Ms. Robinson, but that the medical information requested by Dr. Arnouk had not been received. The denial letter concluded that, based on further review of medical information on July 25, 2001, there was no objective medical information as of the last date of work (March 9, 2001) to support a finding that Plaintiff was disabled. Plaintiff was advised that Dr. Arnouk's Physician Form indicated treatment on March 9, 2001, but that Dr. Arnouk had not

supplied medical documentation to support a disability, and while they had received information

from Ms. Robinson and Dr. Ying-Chang (where data confirmed Plaintiff's condition as of march

27, 2001), they provided no objective medical information to support the disability from March

9, 2001.

The claims handler, Ms. Dube, spoke with Plaintiff on the same date as the letter of

denial (August 14, 2001) and advised him of the same information, to wit, that there was

insufficient information about March 9, 2001, his last date of work.

On August 27, 2001, Plaintiff called and spoke with two different claims handlers, S.

Dunn and D. Matthews.  Both individuals advised Plaintiff that they were seeking additional

information from Dr. Arnouk.[8]  Efforts were made to obtain more records from Dr. Arnouk.  No

further records were sent by Dr. Arnouk because Dr. Arnouk had no written record of the March

9, 2001 visit because it was an emergent, unscheduled "walk-in".[9]

---

[8]  The form first sent by Liberty to Dr. Arnouk by fax of April 18, 2001 requested
materials pertaining to the patient's current disability, office notes for the period of treatment,
test results showing objective findings, a hospital discharge summary and a consulting physician
report if applicable.  Liberty's later request to Dr. Arnouk on July 12, 2001, requested diagnostic
testing, office notes, medication log and medical reports from March 1, 2001 to present.
Although relying in their denial on Plaintiff's statements that he had been suffering from anxiety
for approximately 18 months prior to the incident, Liberty never requested from any provider or
Plaintiff any medical records prior to March 1, 2001.

[9]  Mr. Gambino appeared at Dr. Arnouk's office on March 9, 2001 straight from the
stressful work situation in a very distressed condition, he was very anxious, sweating and very
troubled.  Dr. Arnouk took him into an office and where Mr. Gambino said that he had a problem
at work, that he was very angry and was thinking of causing harm to people he worked with.  Dr.
Arnouk noticed a very difficult psychiatric situation, and immediately referred him to a
psychiatrist.  He advised Plaintiff to stay away from work and try to rest.

On October 1, 2001, Liberty denied the appeal and informed IKON.  IKON then forwarded correspondence on November 9, 2001 to Plaintiff advising him that his unpaid personal medical leave had been exhausted; that they had been advised by Liberty that his STD claim had been denied retroactive to March 9, 2001; and that IKON anticipated that he would return to work without delay.  He was advised that the unpaid personal leave would be extended to November 16, 2001, and he would be required to return to work on November 19, 2001. Plaintiff did not return to IKON and was terminated in December 2001.

Plaintiff understood Liberty's denial of short term benefits to be based on a lack of sufficient medical evidence that Plaintiff was disabled within the meaning of the policy.  For this reason, Plaintiff did not apply for LTD benefits through Liberty or IKON because the definition of disability is the same under both policies.  Danielle Gambino, who was assisting Plaintiff, did not file for LTD benefits for Plaintiff because of her understanding that one cannot get LTD benefits if one does not qualify for STD benefits.  She further saw no reason to apply for long term disability benefits because IKON had terminated Mr. Gambino's employment because he had not returned to work after the denial of short term benefits.

No notice was given to Plaintiff that he might still be eligible for long-term benefits even if he did not qualify for short-term benefits.  Liberty acknowledges that Plaintiff would have qualified as a covered person under the long-term policy, and that he would have been eligible to apply for the 24-month benefit if he could meet the definition of disability.

The short term policy and long term policy are meant to dovetail, which is why the elimination period under the long term policy is six months.  Six months is the maximum benefit under the short term policy.

Plaintiff has been unable to work since March 9, 2001.[10]  He remains under psychiatric care, with substantial medication.  His demeanor at trial showed aberrant agitation and highly unusual affect, at times unable to remain in the courtroom.

## II.     CONCLUSIONS OF LAW

Plaintiff's claims against Liberty are governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq., hereinafter "ERISA".  The Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e).

SHORT-TERM BENEFITS

In cases involving a challenge to an administrator's denial of benefits under an ERISA plan that gives the administrator discretionary authority to construe the terms of the plan, a reviewing court is deferential and will not disturb the denial unless it was arbitrary and capricious.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989);  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997).  Under the "arbitrary and capricious" standard, an administrator's decision will only be overturned if it is without reason or unsupported by substantial evidence or erroneous as a matter of law, and the Court is constrained from substituting its own judgment for that of the administrator in determining eligibility for plan benefits.  Pinto v. Reliance Standard Life Insurance Company, 214 F.3d 377, 387 (3d Cir. 2000).  Where the plan administrator is responsible for determining both eligibility for STD benefits and for paying those benefits, there is a heightened standard of review, recognizing the inherent conflict of interest.  Id. at 392.  The level of scrutiny applied to a fiduciary's decision is a range,

_____

[10]  While he attempted to return to work for 2 weeks in 2002, he was unable to continue due to his psychiatric state.

12

not a point.  Wildbur v. Arko Chemical Co., 974 F.2d 631, 638 (5th Cir. 1992).  It is more penetrating the greater the suspicion of partiality and less penetrating the smaller the suspicion.  Pinto, 214 F.3d at 392-93.

A court's scrutiny will intensify upon a finding that there were procedural irregularities in the decision-making process or that the administrator's decision was the result of overt conflict beyond the inherent financial conflict discussed above.  Id. at 393.  It is the plaintiff's burden to demonstrate the existence of such procedural irregularity or overt conflict warranting the application of a more heightened standard of review, and a reviewing court may not consider unsupported or mere conclusory accusations of same.  Romero v. SmithKline Beecham, 309 F.3d 113, 118 (3d Cir. 2002).  If an insurer wishes to call into question the scientific basis of reports of physicians, the burden lies with the insurer to support the basis of their objection.  Lasser v. Reliance Standard Life Insurance Co., 344 F.3d 381 (3d Cir. 2003).

Thus, under the sliding scale approach, a reviewing court's scrutiny is deferential where there is no evidence of procedural irregularity or overt conflict on the part of the administrator.  Rizzo v. Paul Revere Ins. Group, 925 F. Supp. 302, 310 (D.N.J. 1996).  Accordingly, the scope of review is narrow and a court "is not free to substitute its own judgment for that of [the administrator] in determining eligibility for plan benefits."  Abnathya v. Hoffman-LaRoce, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quoting Lucash v. Strick Corp., 602 F. Supp. 430, 434 (E.D. Pa. 1984)).

Liberty has acknowledged that the sole basis for its denial of STD, was a claimed lack of sufficient information at or around the time of the onset of disability - - March 9, 2001.  The short-term policy states that to be eligible for disability benefits, a claimant must establish that he

13

is unable to perform all of the material and substantial duties of his occupation.  The disability must continue for a period of at least 14 days, the STD "elimination period," before benefits are payable.

Liberty did not inquire into the nature of Plaintiff's duties with IKON.  As of late July 2001, four months after the last date of employment and three months after Liberty was aware of the claim, their records contained a reference to the fact that Plaintiff's job description was not on file.  Thus, Liberty cannot conclude that Plaintiff was able to perform his duties.  The failure to even inquire as to the job duties of the claimant has been found to be evidence of an unreasonable decision, without any further factors.  Quinn v. Blue Cross and Blue Shield Association, 161 F.3d 472 (7th Cir. 1998).  In Quinn, the district court was affirmed in its decision that a claims administrator had acted arbitrarily and capriciously when it denied benefits without knowing the duties of the claimant.  In that matter, the claim administrator based the opinion on her knowledge of the Chicago job market and her notion of what skills are required for the clerical position.  She acknowledged never making any inquiry if there were any limitations on the claimant's ability to work.  Id. at 476.  In this case, Liberty has acknowledged that it never made any inquiry as to the limitations on Plaintiff's ability to work and have not even suggested that it based the denial of STD benefits on any knowledge of the duties necessary for Plaintiff's position.

Liberty's primary (or, indeed, sole) basis for denying benefits was the lack of doctor's notes on March 9, 2001, the date of Plaintiff's first visit with extreme agitation.  When Liberty denied STD benefits based on its determination that it had insufficient information from which to determine whether Plaintiff was disabled, Liberty possessed:

14

I.       A signed and sworn statement by Dr. Arnouk that, as of March 9, 2001,

(a) Plaintiff was suffering from a severe anxiety reaction with depression;

(b) Plaintiff had never had a same or similar condition;

(c) Plaintiff was not cleared to return to work; and

(d) he had referred Plaintiff for psychiatric treatment.

Dr. Arnouk certified that Plaintiff was unable to engage in stressful situations or engage in interpersonal relationships;

II.      Records and the opinion of Dr. Ying-Chang, the treating psychiatrist,

(a) that Plaintiff was diagnosed as suffering from social phobia and major depressive disorder;

(b) that in her opinion Plaintiff could not return to work; and

(c) that Plaintiff's history included thoughts of harming others, and that his psychiatric condition was "major" and "extreme";

III.     Records of the treating therapist, Marion Robinson, with

(a) intake date of March 27, 2001;

(b) references to job stress, increased depression and increased anxiety;

(c) diagnosis of Plaintiff's condition as being "major" depression and panic disorder.

Despite having all of this medical data of disability and none that contradicted this data, Liberty denied the disability.  Their sole basis for the denial was a failure by Dr. Arnouk to provide a contemporaneous office note or record from the March 9, 2001 visit, a record which Dr. Arnouk testified does not exist because of the unusual presentation of Plaintiff in his office.

15

Liberty does not accept the opinions of Dr. Ying-Chang and Ms. Robinson that as of March 27, 2001, Plaintiff was psychologically disabled and could not work.  However, Liberty denied disability benefits on the ground that there was insufficient medical evidence that Plaintiff's psychiatric condition existed 18 days earlier on March 9, 2001.  Liberty had an opinion from Dr. Arnouk attesting to the psychiatric condition on March 9, 2001, but Liberty apparently rejected that opinion because it was not accompanied by an office visit not in the chart.  Liberty did not seek any psychiatrist's opinion that the psychiatric condition noted on March 27 could not have existed on March 9 to refute Dr. Arnouk's affidavit.  Under the terms of the policy, Liberty could have had Plaintiff evaluated by a psychological expert but declined to do so.  Thus, Liberty's determination that Plaintiff was not "disabled" is arbitrary and capricious.[11]

Liberty does not explain why it chose to ignore the opinions of the treating physicians as of March 9, 2001 and thereafter, supported by ample documentary evidence, that Plaintiff was disabled and unable to return to work when it adduced absolutely no evidence before it to indicate anything to the contrary.  Because an insurer is not free to simply ignore the scientific bases of physicians' reports without supporting the basis of its objection, see Lasser, 344 F.3d 381 (3d Cir. 2003), this Court finds that Liberty acted in an arbitrary and capricious manner when

---

[11]  Moreover, the nurse who reviewed the medical evidence for Liberty appears to have seized upon any possible basis to ignore the ample and strong evidence of psychiatric disability. The nurse seized upon a stray comment that Plaintiff stated that he had been suffering from anxiety for one-and-a-half to two years before he stopped working.  Although it was clear that Plaintiff had not been under psychiatric care during this period of time, the nurse claimed to be unable to figure out "what changed" as of March 9, 2001, despite clear and compelling notes of both Dr. Ying-Chang and Ms. Robinson about what had changed, i.e., Plaintiff's acute anxiety, depression and panic.  Morever, Harriet Michaels, who made the ultimate appeal decision, testified that she did not conduct any independent review of the information but rather simply followed the decisions of the nurse and the claims handlers.

it ignored the reports of Plaintiff's physicians and substituted its own unsupported conclusion that there was insufficient information to determine that Plaintiff was disabled as of his last day of work.  Accordingly, Plaintiff is entitled to an award of short-term disability benefits in the amount of $22,749.13.

<u>LONG-TERM BENEFITS</u>

Pursuant to 29 U.S.C. § 1132(a)(3)(B)(I), a plan participant may bring a civil action to obtain equitable relief to redress violations of ERISA or the terms of the plan.

Liberty disclaims liability for long term benefits by arguing that had Plaintiff applied for LTD benefits and been denied by Liberty on the same finding of lack of proof of disability, IKON could have come to a contrary conclusion.  No IKON employee testified to such likelihood, nor was any evidence adduced of IKON overruling Liberty's LTD determinations in any other case.  The evidence shows that IKON, immediately accepted Liberty's determination as to STD, as the contract required, and then went a step further by directing Plaintiff to return to work or be fired.  When Plaintiff was unable to return to work as ordered, he was fired.

Liberty both administered and insured the short-term benefits, and Liberty drafted both policies.  The insurance policies were designed to dovetail, in that the 180-day period of short-term benefits was the same period of time as the elimination period for the long-term benefits.  The disability definition is identical in both policies.  It is entirely foreseeable that a denial of short-term benefits for failure to establish "disability" would likely cause a beneficiary to assume that an LTD claim would be futile.

Plaintiff could not have been expected to have applied for long-term benefits after having been repeatedly advised by Liberty after many reviews that he had not established proof of

disability - - when the definition is identical for both policies.  No notice was sent to Plaintiff that an LTD application might be considered notwithstanding the finding of non-disability.  Despite Liberty's position that such an application was possible in theory, no evidence has been adduced to show even one instance in which an employee of IKON or any member of an insured plan of Liberty was denied short-term benefits, but then was awarded long-term benefits.

Because the Court finds that Defendant violated the provisions of ERISA in denying Plaintiff short-term benefits in an arbitrary and capricious manner, the Court finds that Plaintiff is entitled to equitable relief with respect to his request for long term benefits.  Pursuant to section E of part six of the LTD policy, Liberty had sole discretion to determine whether "any claim or suit, arising by reason of any liability or alleged liability of Liberty in connection with the performance of any of its functions under this Agreement, will be paid, compromised, litigated or appealed, and Liberty will also have sole discretion regarding all matters of procedure and defense for any such claim or suit."  This provision provides Liberty with the discretion regarding all matters of procedure and therefore Liberty may permit Plaintiff to submit an application for LTD benefits beyond the time period set forth in the policy.  Accordingly, this matter will be remanded to Liberty with the instruction that Plaintiff be allowed to make an application for long term disability benefits, <u>as if filed in a timely manner,</u>[12] and provide all relevant proofs necessary for a determination of entitlement to benefits.[13]  Liberty shall consider

---

[12]  Liberty's erroneous denial of STD benefits provides an adequate basis for equitable tolling of the time period for filing the LTD claim.  The time period for filing shall begin to run upon the date of this Opinion and Order.

[13]  Plaintiff's proofs will be limited to those that would have been available had Plaintiff applied for long term disability benefits in 2001.

Plaintiff's LTD application and proofs, if filed, and make a recommendation to IKON, using the usual and customary procedures for evaluating LTD claims.

## III.   CONCLUSION

For the reasons stated above, the Court finds that Plaintiff is entitled to short term disability benefits in the amount of $22,749.13, plus reasonable attorney's fees.  The Court remands Plaintiff's long term disability claim to Liberty for evaluation pursuant to this Opinion. An appropriate Order shall issue.

/s/ Faith  S. Hochberg
Hon. Faith S. Hochberg, U.S.D.J.

19